UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 14 CR 462 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| SCOTT GINSBERG, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

In August 2014, the government indicted Defendant Scott Ginsberg for financial institution fraud, in violation of 18 U.S.C. § 1344, and making false statements to a bank, in violation of 18 U.S.C. § 1014, in connection with a scheme to obtain mortgage loans to finance the purchase of condominium units at the Springhill Development in Roselle, Illinois. Mr. Ginsberg's first trial, in October 2016, resulted in a mistrial. Mr. Ginsberg did not testify at the first trial. The government then filed a superseding indictment in March 2017, proceeding on twelve counts of financial institution fraud in connection with the purchases of condominiums in the Springhill Development by Gregory Callahan, Judith Ellis, and Martin Swidler. The second trial occurred in March 2018, with the jury finding Mr. Ginsberg guilty on all twelve counts. Mr. Ginsberg again did not testify at the second trial.

After trial, Mr. Ginsberg retained new counsel and filed a motion for new trial, arguing that his trial counsel provided ineffective assistance of counsel and that the Court made evidentiary errors in admitting certain testimony. The Court held an evidentiary hearing on the ineffective assistance claims on October 29, 2018. The Court now denies Mr. Ginsberg's motion for new trial, finding that Mr. Ginsberg did not receive ineffective assistance of counsel and that the Court properly admitted the challenged evidence.

**LEGAL STANDARD**

Federal Rule of Criminal Procedure 33 allows "a district court to grant a timely request for a new trial 'if the interest of justice so requires.'" *United States v. O'Malley*, 833 F.3d 810, 811 (7th Cir. 2016) (quoting Fed. R. Crim. P. 33(a)). A new trial is warranted where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989); *see also United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006) ("A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict."). "[T]he exercise of power conferred by Rule 33 is reserved for only the most 'extreme cases.'" *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990)).

**ANALYSIS**

**I.    Ineffective Assistance of Counsel**

A defendant may seek a new trial based on ineffective assistance of counsel. *United States v. Taglia*, 922 F.2d 413, 417 (7th Cir. 1991). To establish constitutionally ineffective assistance of counsel, Mr. Ginsberg must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In considering the first prong, the Court indulges "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and may not let hindsight interfere with its review of counsel's decisions. *Id.* at 689. For the second prong, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

This means a "substantial," not just "conceivable," likelihood of a different outcome in the case. *Cullen v. Pinholster*, 563 U.S. 170, 189, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). The Court need not address both prongs of the *Strickland* test if one provides the answer; that is, if the Court determines that the alleged deficiency did not prejudice Mr. Ginsberg, it need not consider the first prong. *Ruhl v. Hardy*, 743 F.3d 1083, 1092 (7th Cir. 2014).

Mr. Ginsberg raises two grounds for his ineffective assistance claim: (1) that his counsel, Jack Rimland, provided him with erroneous advice concerning his right to testify in his own defense, and (2) that Mr. Rimland failed to investigate potential defense witnesses. "Typically, an ineffective assistance claim raised in a motion for new trial is addressed by holding an evidentiary hearing for the trial court to consider the evidence of the trial counsel's deficiency and its possible effect on the outcome." *United States v. Malone*, 484 F.3d 916, 919 (7th Cir. 2007). The Court held a hearing and has considered the testimony of both Mr. Rimland and Mr. Ginsberg at that hearing, along with the additional material submitted by Mr. Ginsberg and the government, in addressing Mr. Ginsberg's two claimed grounds for ineffective assistance below.

    A.    **Mr. Ginsberg's Decision Not to Testify**

A defendant has the fundamental right to testify in his own defense. *See Sarfraz v. Smith*, 885 F.3d 1029, 1037 (7th Cir. 2018) (right to testify in own defense provided by the Fourteenth Amendment's due process clause and the Sixth Amendment's compulsory process clause). "[O]nly the defendant himself, not his lawyer, can waive the right to testify." *Barrow v. Uchtman*, 398 F.3d 597, 608 (7th Cir. 2005). A defendant must waive his right to testify voluntarily, knowingly, and intelligently. *Starkweather v. Smith*, 574 F.3d 399, 403 (7th Cir. 2009).

Here, Mr. Ginsberg argues that he decided not to testify at his second trial based on Mr. Rimland telling him, shortly before needing to make the final decision about testifying, that testifying would harm Mr. Ginsberg's defense because the government would cross-examine Mr. Ginsberg on "every real estate deal [he] had made in the past 20 years and would make [him] look very dirty to the jury." Doc. 115-1 ¶ 9. According to Mr. Ginsberg, this last-minute information caused him to rethink his decision to testify and to ultimately exercise his right to remain silent. Mr. Ginsberg now argues that Mr. Rimland incorrectly stated that the government may be able to pursue this line of questioning based on the Court's ruling on his motion *in limine* concerning prior transactions and the government's representations at the first pretrial conference that it did not intend to argue that the jury should consider non-Springhill transactions in determining guilt. Mr. Ginsberg claims that, based on this allegedly incorrect advice, he did not make a fully informed decision as to whether to testify. *See Starkweather*, 574 F.3d at 403 ("[A] number of cases have held that *incorrect* advice that induces a defendant to waive his right to testify can constitute ineffective assistance." (collecting cases)).

But Mr. Ginsberg cannot establish that Mr. Rimland provided him with incorrect advice about the government's ability to cross-examine him on his prior real estate history. Mr. Ginsberg bases his claim on too broad of an interpretation of the discussion regarding and the ruling on his motion *in limine* related to prior transactions. That motion *in limine* purportedly sought to prohibit the government from introducing testimony, evidence, or argument related to any real estate transactions between Mr. Ginsberg and any witness, aside from those involving the Springhill Development. *See* Doc. 33. But the motion only referenced the potential testimony of Ms. Ellis and Mr. Swidler, *id.* at 2–3, with the government's response similarly focused only on these two individuals, Doc. 35 (stating that Mr. Ginsberg "seeks to bar the

4

government from eliciting testimony from two witnesses regarding their participation in certain real estate transactions with defendant pursuant to Federal Rule of Evidence 404(b)"). In addressing the motion at the first pretrial conference, the parties and the Court proceeded based on the understanding that it covered only the government's case-in-chief. The government disavowed any propensity argument, stating during the pretrial conference that "[i]t's certainly not our intent to argue that he's done it before so, therefore, he did it in this case." *See* Pretrial Conf. Tr. 16–17. The government agreed that Ms. Ellis and Mr. Swidler would speak only about the Springhill Development transactions, with them refraining from addressing prior transactions as the reason for buying Springhill Development properties. *Id.* at 18–19. The Court did not address the government's ability to confront Mr. Ginsberg with his prior real estate transactions if he decided to testify, an issue not explicitly raised in Mr. Ginsberg's motion *in limine* or brought up by either side at the pretrial conference.

Mr. Ginsberg chose not to testify at the first trial, but he claims that after it ended in a mistrial, he realized he needed to testify at the second trial to better make his case to the jury. He acknowledges that Mr. Rimland informed him of the Court's ruling on the motion *in limine*, and that he discussed his testimony with Mr. Rimland prior to the second trial, including potential areas of cross-examination. On the last day of the second trial, the Court took a lunch break before Mr. Ginsberg's planned testimony. During that lunch break, Mr. Rimland recounts that the government approached him and told him that, were Mr. Ginsberg to testify, the government would inquire about his prior real estate transactions on cross-examination. Mr. Rimland then informed Mr. Ginsberg of the government's intention to raise these questions. Mr. Ginsberg testified that he told Mr. Rimland he had no worries about such questioning for two reasons: (1) he did not have anything to hide because all his prior transactions were legitimate, and (2) he

5

believed that the government could not bring up his prior real estate transactions because the Court had previously excluded them from the trial. But because Mr. Rimland told him that such questions were fair game and the inquiry could harm his defense, his family became upset and he ultimately decided not to testify.

In his closing argument after the evidentiary hearing, Mr. Ginsberg acknowledged that the Court's ruling on the motion *in limine* covered only the government's case-in-chief, meaning that his claim that Mr. Rimland provided incorrect advice because of the Court's ruling fails at the outset. This indeed is the only possible interpretation of that ruling. Instead, Mr. Ginsberg now pins his argument on the government's statement during the pretrial conference that it would not make any propensity arguments with respect to these other transactions and the contention that Mr. Rimland should have asked for clarification of the government's position. But the government's statement and Mr. Rimland's failure to seek clarification do not lead to the conclusion that Mr. Rimland provided incorrect advice about the potential perils of testifying. The government merely represented at the pretrial conference that it would not make any improper propensity argument under Federal Rule of Evidence 404(b). Its statement would not have precluded the government from inquiring about Mr. Ginsberg's prior real estate history for other permissible purposes when cross-examining Mr. Ginsberg. By testifying, Mr. Ginsberg would have opened the door to impeachment and attacks on his credibility pursuant to Rule 608(b). *See United States v. Parkhurst*, 865 F.3d 509, 521 (7th Cir. 2017) ("It is well-settled that when a criminal defendant elects to testify in his own defense, he puts his credibility in issue and exposes himself to cross-examination, including the possibility that his testimony will be impeached." (quoting *United States v. Kohli*, 847 F.3d 483, 492 (7th Cir. 2017))); *United States v. Miles*, 207 F.3d 988, 993–94 (7th Cir. 2000) (noting that conduct related to fraud, deceit, or

6

dishonesty "plainly relate[s] to a witness's truthfulness or untruthfulness"). And where Mr. Rimland had previously advised Mr. Ginsberg that his intent was at issue in the trial, Mr. Rimland understood that the government could impeach Mr. Ginsberg's testimony to the extent he denied having the requisite intent to defraud with evidence of his conduct in other real estate deals that contradicted his testimony and would have shown that Mr. Ginsberg, and not other individuals, devised the scheme at issue. Because valid bases for cross-examination regarding Mr. Ginsberg's prior real estate transactions existed, Mr. Rimland acted appropriately in advising Mr. Ginsberg of these potential questions, even without seeking further clarification from the Court. Therefore, Mr. Rimland did not provide ineffective assistance to Mr. Ginsberg where he based his recommendation on "a reasonable strategic decision . . . that [the defendant] not testify because of the possible adverse consequences of doing so." *Lee v. Murphy*, 41 F.3d 311, 316 (7th Cir. 1994).

Instead, the Court acknowledges Mr. Ginsberg's claim for what it is—a post hoc justification in an attempt to avoid his conviction that is belied by his inconsistent representations on the issue and his colloquy with the Court during the second trial. For example, in his declaration in support of his motion, Mr. Ginsberg stated that Mr. Rimland did not discuss the motion *in limine* ruling with him and that if they had discussed the motion *in limine* ruling, he would have taken the stand. *See* Doc. 115-1 ¶¶ 9, 11. But Mr. Ginsberg testified that he himself brought the motion *in limine* up during his conversation with Mr. Rimland over the lunch break on the last day of trial and admitted that he knew of the ruling because Mr. Rimland told him about it after the first pretrial conference. Both cannot be true; crediting both means that Mr. Ginsberg intended to take the stand in his own defense but did not for reasons aside from the government's intention to question him about prior transactions.

7

Instead of choosing to testify despite his interpretation of the Court's ruling and his professed belief that the government's line of questioning would not harm his defense, Mr. Ginsberg clearly and unequivocally waived his right to testify during the second trial without mention of any of the concerns now raised in his motion for new trial or expressing any doubt about the decision. *See* Second Trial Tr. 622–24. The Court asked Mr. Ginsberg whether he understood that he had the right to testify, as well as the right to remain silent, and, knowing those things, whether he still desired not to testify. *Id.* at 623. Mr. Ginsberg responded in the affirmative to all questions without any hesitation. *Id.* And Mr. Ginsberg cannot plausibly argue that the Court did not give him an opportunity to raise any concerns. The Court allowed Mr. Ginsberg to speak further on his request, but instead of inquiring about the government's ability to ask him about prior transactions or asking for more time to make his decision, Mr. Ginsberg chose to share the following sentiment: "I just really want to say God bless America. I really love all of the people in the country, and I respect everybody. . . . And may we all live good healthy lives. Amen." *Id.* at 624. Based on the colloquy between the Court and Mr. Ginsberg, Mr. Ginsberg cannot now argue that he did not knowingly, intelligently, or voluntarily waive his right to testify. *See Ward v. Sternes*, 334 F.3d 696, 707 (7th Cir. 2003) ("[A] direct, unequivocal answer to a trial court's colloquy will suffice to find a knowing, intelligent waiver[.]"). And because he cannot show that Mr. Rimland provided him with incorrect advice concerning his right to testify in his own defense, his ineffective assistance claim fails on this ground.

### B. Failure to Investigate Potential Defense Witnesses

Mr. Ginsberg also argues that Mr. Rimland provided ineffective assistance by failing to investigate and interview several potential witnesses: (1) Jeffrey Stec, a loan officer for Homestead Mortgage who processed applications for several transactions involving Mr.

8

Callahan; (2) Cassaundra Greenfield, a loan officer for Chicago Funding who processed applications for transactions involving Ms. Ellis, Mr. Swidler, and Mr. Callahan; and (3) Greg Carlson, the owner of the condo conversion company involved in the Springhill Development.[1] Although a decision not to call witnesses at trial made after investigating their testimony is a strategic one, the "[f]ailure to conduct any investigation regarding the potentially exculpatory witnesses certainly would constitute deficient performance." *United States v. Simpson*, 864 F.3d 830, 835 (7th Cir. 2017); *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("Though there may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney must investigate a case in order to provide minimally competent representation.").

Here, Mr. Ginsberg argues that Mr. Rimland failed to interview Mr. Stec, Ms. Greenfield, and Mr. Carlson, prejudicing him at trial because these witnesses would have provided testimony concerning who was responsible for providing contracts to the lenders. In support of his claim that these three witnesses would have provided favorable testimony, Mr. Ginsberg has only provided a transcript of an interview between Mr. Stec and Mr. Ginsberg's new investigator. Mr. Ginsberg's investigator could not make contact with Ms. Greenfield or Mr. Carlson, and neither appeared at the evidentiary hearing, despite representations by Mr. Ginsberg's counsel that the defense would subpoena them to appear at such an evidentiary hearing. *See* Doc. 122 ¶ 19. For these two individuals, Mr. Ginsberg instead tendered his declaration, stating that Mr. Smith had responsibility to forward the second amended contract to the bank and that Mr. Smith and/or Mr. Carlson would have passed the contract on to Ms. Greenfield and contending that this

---

[1] Initially, Mr. Ginsberg also claimed that Mr. Rimland should have investigated Ken Smith, a sales representative for the condo conversion company who worked onsite at the Springhill Development. After considering the government's response to his motion, Mr. Ginsberg acknowledges that, based on Mr. Smith's statements to the FBI, Mr. Rimland was not ineffective for failing to call Mr. Smith as a defense witness. *See* Doc. 124 at 5 n.1.

expected testimony would have supported a defense theory that these individuals forwarded the necessary information to the banks.  Doc. 122-3 ¶ 8.  But Mr. Ginsberg's presentation on these witnesses' expected testimony does not meet Mr. Ginsberg's "burden of providing the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced," with respect to Ms. Greenfield and Mr. Carlson.  *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003) (citation omitted) (internal quotation marks omitted); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit.  A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." (footnote omitted)).

Even assuming Mr. Ginsberg had made a proper showing of all three potential witnesses' testimony, he cannot establish that his counsel did not conduct an adequate investigation into these witnesses.  Mr. Rimland testified that he reviewed all the discovery provided by the government, including the government's interview summaries and grand jury transcripts related to Mr. Stec, Ms. Greenfield, and Mr. Carlson.  Additionally, Mr. Rimland had his investigator seek to interview these individuals and other potential witnesses.  Mr. Rimland recalled that his investigator did not make contact with all of them but at least spoke with Mr. Stec's attorney and provided investigative reports on all three witnesses challenged here.  Mr. Rimland thus had sufficient information on which to base his decision whether to pursue further investigation and call them at trial.  *See United States v. Jackson*, 935 F.2d 832, 846 (7th Cir. 1991) ("It is not ineffective assistance for defense counsel to make a tactical decision not to pursue a course of investigation that would produce evidence that the counsel otherwise is aware of or that would add little to otherwise available information.").  And from this review of Mr. Stec, Ms.

Greenfield, and Mr. Carlson's potential testimony, along with his discussions with other potential witnesses, Mr. Rimland determined that their testimony would harm Mr. Ginsberg's case because they would attempt to shift the blame to Mr. Ginsberg. Mr. Rimland also concluded that they would not add anything of value to Mr. Ginsberg's defense, with the defense able to bring out evidence concerning who had the responsibility of providing the second amended contracts through other witnesses. The Court's review of the summary reports provided by the government and Mr. Ginsberg's investigator's more recent conversation with Mr. Stec support Mr. Rimland's determination that these individuals would have distanced themselves from any wrongdoing, potentially implicated Mr. Ginsberg instead, and added little to further Mr. Ginsberg's defense at trial. Therefore, the Court finds Mr. Rimland's decision not to call Mr. Stec, Ms. Greenfield, and Mr. Carlson reasonable and strategic, meaning this ground of his ineffective assistance claim fails as well.

### C. Cumulative Error

Ginsberg argues that the Court should consider the cumulative effect of Mr. Rimland's alleged errors in deciding whether to grant his motion for a new trial. But because the Court has concluded that Mr. Rimland acted reasonably in both instances, defeating Mr. Ginsberg's ineffective assistance claims, the Court need not address the cumulative prejudice to Mr. Ginsberg arising from any alleged errors.

## II. Evidentiary Issues

### A. Admission of Ronald Ellis' Statements

First, Mr. Ginsberg challenges the Court's admission of statements made by Robert Ellis under Federal Rule of Evidence 801(d)(2)(E). Specifically, Mr. Ginsberg objects to the testimony of Mr. Ellis' wife, in which Ms. Ellis stated that Mr. Ellis told her that "Mr. Ginsberg

11

thought he would like – wanted to know whether we could bump up our income and that he needed it to have a little more income." Second Trial Tr. 197. Ms. Ellis further testified that when she responded that she was "only a teacher," her husband asked "Well, what about tutoring?" *Id.* Mr. Ginsberg argues that the government failed to carry its burden of proving at trial that these statements amounted to co-conspirator statements as set forth in its *Santiago* proffer, contending that these statements are ambiguous and not facially conspiratorial.

Under Rule 801(d)(2)(E), a statement is not considered hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The government must establish, by a preponderance of the evidence, that "(1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement(s) sought to be admitted were made during and in furtherance of the conspiracy." *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). In seeking to use a co-conspirator statement, the government provides a proffer prior to trial, allowing the Court to make a preliminary determination of its admissibility. *United States v. Santiago*, 582 F.2d 1128, 1130–31 (7th Cir. 1978), *overruled on other grounds by Bourjaily v. United States*, 438 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987). Based on the *Santiago* proffer, the court may "'conditionally admit coconspirator statements' if the government makes a showing that it can and will meet the requirements for admissibility during trial." *United States v. Cardena*, 842 F.3d 959, 994 (7th Cir. 2016) (quoting *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999)). "If at the close of its case the prosecution has not met its burden to show that the statements are admissible, the defendant can move for a mistrial or to have the statements stricken." *Haynie*, 179 F.3d at 1050.

Before Mr. Ginsberg's first trial, the government filed a *Santiago* proffer, which set forth the conspiracy and the statements it would seek to admit pursuant to Rule 801(d)(2)(E). The Court heard argument about the anticipated testimony at the pretrial conference for the first trial but reserved ruling on the admissibility of the statements until obtaining a proffer of Ms. Ellis' testimony outside the jury's presence at trial. Pretrial Conf. Tr. 20–25. During the first trial, the Court heard the government's proffer and overruled Mr. Ginsberg's objection to the admission of the statements. The Court concluded that the statements went to intent in relation to the loan applications, where the loan applications reflected income from a tutoring business that did not exist at the time, and were made to help further the scheme of buying the Springhill Development properties and turn a profit. First Trial Tr. 460–66, 514–16. During the second trial, Ms. Ellis again testified to the conversation she had with her husband regarding bumping up her income, stating that she understood it to mean "[t]hat we needed to show more income on our application . . . [b]ecause there were more and more mortgages being obtained." Second Trial Tr. 197. Ms. Ellis also testified that, despite stating on her loan applications that she made $2,300 per month from her tutoring business, she did not make that much from tutoring and was not actually tutoring at the time she filled out the applications. *Id.* at 198.

Mr. Ginsberg now argues that the government failed to prove at trial that the admitted statements were made in furtherance of a conspiracy, where Mr. Ellis' statements could be innocently interpreted as comments on the need to find new sources of income in order for Ms. Ellis to qualify for the loans instead of in a conspiratorial manner that Mr. Ginsberg and Mr. Ellis wanted Ms. Ellis to falsely inflate her income on the loan applications. He also argues that the government did not introduce sufficient evidence to support a conspiracy between Mr. Ellis and Mr. Ginsberg.

To establish a conspiracy, the government needed to prove "an agreement to commit some illegal act and that the alleged conspirator knew 'something of its general scope and objective though not necessarily its details.'" *United States v. Mahkimetas*, 991 F.2d 379, 382 (7th Cir. 1993) (quoting *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir. 1985)). A conspiracy cannot be based solely on the co-conspirator's statement; additional independent evidence to corroborate the conspiracy is required. *United States v. Quiroz*, 874 F.3d 562, 570 (7th Cir. 2017). Although other individuals, such as mortgage brokers and loan officers, were also involved in the scheme, this does not preclude finding that Mr. Ellis and Mr. Ginsberg participated in that scheme jointly at the time Mr. Ellis made the statements. Ms. Ellis testified that her husband introduced her to Mr. Ginsberg and acted essentially as a go-between to facilitate the closings on the units they bought in the interest of obtaining additional income. She further testified that Mr. Ellis accompanied her to all closings and communicated with other parties involved in the loan process. And Mr. Ellis received payments from Mr. Ginsberg after the transactions closed, even though he did not purchase any properties in his name. This testimony, along with the statements at issue, sufficiently established by a preponderance of the evidence the existence of a conspiracy involving both Mr. Ellis and Mr. Ginsberg to defraud lenders and make money by recruiting straw buyers to purchase condominium units.

Moving on to the next issue, a statement is made in furtherance of a conspiracy "when the statement is 'part of the information flow between conspirators intended to help each perform his role.'" *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989) (quoting *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988)). The Court may find a statement furthered the conspiracy even if "the statement [was] susceptible to alternative interpretations." *United States v. Shoffner*, 826 F.2d 619, 628 (7th Cir. 1987) (alteration in original) (quoting *United

14

*States v. Mackey*, 571 F.2d 376, 383 (7th Cir. 1978)). The government advanced a plausible theory for how Mr. Ellis' statements furthered the conspiracy: they caused Ms. Ellis to inflate her income so she could qualify for loans to finance the purchase of numerous condominium units at the Springhill Development. This allowed Mr. Ginsberg to obtain his consulting fee and the Ellis' to receive additional income as well. Taken in context, the statements clearly furthered the conspiracy because Mr. Ellis knew that his wife did not have an ongoing tutoring business and that to obtain the mortgages for the properties at issue, Ms. Ellis needed to list more income than she legitimately had. *See Alviar*, 573 F.3d at 545 ("In conspiracy cases statements that are 'part of the information flow between conspirators intended to help each perform his role' satisfy the 'in furtherance' requirement of Rule 801(d)(2)(e)." (quoting *Garlington*, 879 F.2d at 283)); *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991) (statements in furtherance of a conspiracy include "statements made to conduct and further the business of" the conspiracy). Mr. Ginsberg's newfound rationalization that Mr. Ellis made the comment to encourage his wife to begin tutoring to increase her income does not align with the evidence presented, particularly where the loan applications indicated the tutoring business had been ongoing for many years. Instead, the statements amounted to a direction to invent additional income that could appear legitimate based on Ms. Ellis' job as a teacher. This phantom income then increased the likelihood of approval of the mortgages, allowing Mr. Ginsberg and the Ellis' to obtain additional properties and financing with no intention of repaying the loans. Therefore, the government more than met its burden of satisfying the in furtherance of requirement by a preponderance of the evidence, and the Court does not find that the admission of the co-conspirator statements warrants a new trial.

## B. Cross-Examination of Maureen Welborn

Finally, Mr. Ginsberg challenges the Court's allowance of a line of questioning on cross-examination of Maureen Welborn, who worked as a closer for Republic Title Company, one of the title companies used to close the transactions at issue. Mr. Ginsberg called Ms. Welborn in his defense, and during the direct examination, Ms. Welborn testified that Mr. Ginsberg did not play a major role in the closings and did not direct her actions. Second Trial Tr. 586–89. On cross-examination, the government sought to impeach this testimony. Ms. Welborn testified that Republic Title stopped closing transactions with Mr. Ginsberg because multiple transactions involved the same buyer and different lenders, and that after Mr. Ginsberg learned of this, he asked Ms. Wellborn to "[w]ork [her] magic" to allow the closings to occur. *Id.* at 607–08, 615–16. Mr. Ginsberg objected to this testimony, arguing that these transactions occurred after those at issue in the case. The Court overruled the objection, finding that the testimony had relevance to Mr. Ginsberg's intent in providing false information to the lenders and to his involvement in closings, particularly to the extent Mr. Ginsberg argued that he did not direct anything with respect to the transactions. *Id.* at 610–11. Mr. Ginsberg again claims the Court should not have admitted this evidence because the testimony was too speculative to be probative and prejudiced Mr. Ginsberg because it invited the jury to speculate that the bank had just learned of criminal activity and that such activity was related to the transactions at issue in this case.[2]

Having reviewed the trial transcript and the parties' submissions, the Court does not find Mr. Ginsberg's renewed arguments persuasive. During his direct examination of Ms. Welborn, Mr. Ginsberg sought to distance himself from the real estate transactions, supported by Ms. Welborn's testimony that the attorneys had the most involvement in directing payments from the

---

[2] Mr. Ginsberg does not argue that the testimony should have been excluded pursuant to Federal Rule of Evidence 404(b), instead apparently focusing on Rule 403's balancing test.

closings. After Ms. Welborn testified that "nothing unusual" stuck out to her about Mr. Ginsberg's participation in the closings, Mr. Ginsberg's attorney asked Ms. Welborn if she had "reference[d] at some point that about all he did was order a pizza once." *Id.* at 589. As the Court ruled during trial, Ms. Welborn's testimony regarding Mr. Ginsberg's request that she "work [her] magic" suggests that Mr. Ginsberg played a greater role in the closings, contradicting her testimony that Mr. Ginsberg had no meaningful involvement in the transactions. While the testimony was to some extent prejudicial to Mr. Ginsberg, Mr. Ginsberg has not presented a basis for the Court to find that its admission was unduly prejudicial, as required for exclusion under Rule 403. *See United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003) ("When considering the prejudicial nature of evidence under Rule 402, we have noted that most relevant evidence is, by its very nature, prejudicial, . . . that evidence must be *unfairly* prejudicial to be excluded. Evidence is unfairly prejudicial if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." (alterations in original) (citations omitted) (internal quotation marks omitted)). Although Mr. Ginsberg now argues that the jury did not need to hear this additional evidence after having heard several days of evidence concerning the subject transactions and having the transaction documents to review, the Court does not find Ms. Welborn's testimony so speculative, prejudicial, or cumulative that it had an injurious effect on the verdict. Because Ms. Welborn's testimony did not require exclusion under Rule 403's balancing test, its admission does not warrant a new trial.

17

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Ginsberg's motion for new trial [115].

Dated: November 2, 2018

_____
SARA L. ELLIS
United States District Judge